IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

**FILED**

MAY 27 2014

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

KIM AND THOMAS BROOME,                    )
                                          )
    Plaintiffs, on behalf of a        )
    Putative Class,                   )
v.                                        )
                                          )
NATIONAL UNION FIRE INSURANCE             )
COMPANYOF PITTSBURGH, PA,                 )
HEALTHEXTRAS, INC., CATALYST              )
HEALTH SOLUTIONS, INC., CATAMARAN         )
HEALTH SOLUTIONS, LLC, HEALTHEXTRAS,)
LLC, ALLIANT INSURANCE SERVICES, INC., )
ALLIANT SERVICES HOUSTON, INC., and       )
VIRGINIA SURETY COMPANY, INC.,            )
                                          )
    Defendants.                       )

CASE NO.:

2:14 cv 156-Jordan/Inman

CLASS ACTION

## COMPLAINT

    Now come the Plaintiffs, Kim and Thomas Broome, on behalf of themselves and all other similarly situated residents of the State of Tennessee and allege as follows:

    1.    Plaintiffs, Kim and Thomas Broome, are residents of Greene County, Tennessee, who purchased insurance coverage advertised under the name HealthExtras that purportedly provided them with a One Million Dollar ($1,000,000.00) lump sum Accidental Permanent and Total Disability Benefit in the event that the named insured became permanently disabled and could not return to work, underwritten by National Union Fire Insurance Company of Pittsburgh, PA, and a Two Thousand Five Hundred ($2,500.00) Emergency Accident and Sickness Medical Expense Benefit underwritten by Virginia Surety Company, Inc.

1

2.     Defendant National Union Fire Insurance Company of Pittsburgh, PA, a member of American International Group, Inc. (AIG) (hereinafter "National Union"), was and is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has done business at all relevant times in the State of Tennessee, with its principal office located at 175 Water Street, 18th Floor, New York, NY 10038. Upon information and belief, Defendant National Union, at all times relevant to this action, was licensed as an insurance company and/or underwriter in the State of Tennessee.

3.     Defendant HealthExtras, Inc., (hereinafter "HealthExtras Inc.") was formed in 1997 under the laws of the State of Delaware and has done business at all relevant times in the State of Tennessee. HealthExtras, Inc. was never licensed or authorized by the Tennessee Secretary of State to conduct business in Tennessee or by the Tennessee Department of Insurance to conduct insurance transactions in Tennessee, including the marketing and sale of insurance products in Tennessee.

4.     Catalyst Health Solutions, Inc. (hereinafter "Catalyst") was and is a corporation organized and existing under the laws of the State of Delaware and has done business at all relevant times in the State of Tennessee. Catalyst was never licensed or authorized by the Tennessee Secretary of State to conduct business in Tennessee or by the Tennessee Department of Insurance to conduct insurance transactions in Tennessee, including the marketing and sale of insurance products in Tennessee.

5.     Catamaran Health Solutions, LLC (hereinafter "Catamaran") is a limited liability company organized and existing under the laws of the State of Delaware and has done business at all relevant times in the State of Tennessee. Catamaran has never been licensed or authorized

2

by the Tennessee Secretary of State to conduct business in Tennessee or by the Tennessee Department of Insurance to conduct insurance transactions in Tennessee, including the marketing and sale of insurance products in Tennessee.

6. Upon information and belief, HealthExtras Inc. was incorporated in 1997 and changed its name to Catalyst Health Solutions, Inc., in 2008. Catalyst Health Solutions, Inc., was purchased by SXC Health Solutions in July 2012. Those companies merged together to form Catamaran Health Solutions, LLC in July 2012. Defendant HealthExtras, Inc. has asserted that on October 1, 2008, it changed its name to Catalyst Health Solutions, Inc., and therefore, it no longer exists. However, HealthExtras, Inc. and its successor corporations Catalyst Health Solutions, Inc., and Catamaran Health Solutions, LLC continued to operate under the name of "HealthExtras" to conduct business, service and administer the disability policies that are the subject of this lawsuit until at least August 1, 2012. HealthExtras, Inc. Catalyst and Catamaran have all operated at some time under the name of "HealthExtras" to conduct business, and to service and administer the disability policies that is the subject of this lawsuit until at least August 1, 2012. Contrary to the assertion that the Healthextras Inc., changed its name, it, along with Catalyst and Catamaran continued to operate under the name "Healthextras" by communicating in writing with insureds around the country via the United States mail and via electronic mail using the name "Healthextras" on correspondence. Further confusing matters, Catamaran has represented and referred to itself as the "HealthExtras Defendants" in other pending Federal Court actions involving the HealthExtras Scheme that is the subject of this lawsuit. Consequently, the Plaintiff will refer to these entities as Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. in this Complaint.

3

7. HealthExtras, LLC (hereinafter "HealthExtras, LLC") is a limited liability company, formed and organized under the laws of the State of Delaware by officers and directors of HealthExtras, Inc., and Catalyst in October 2010. In July 2012, HealthExtras, LLC, was owned and operated by Catamaran Corp., a publicly traded company and the parent company of Catamaran Health Solutions, LLC. On August 1, 2012 the Catamaran Corp. sold HealthExtras, LLC to a different entity and caused the HealthExtras disability policy that is the subject of this lawsuit to be transferred to it for servicing, administration and collection of insurance premiums. HealthExtras, LLC currently services, administers, collects and allocates premiums for the insurance Scheme complained of herein and continues to use the same trade name of "HealthExtras" used by Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. HealthExtras, LLC has never been licensed or authorized by the Tennessee Secretary of State to conduct business in Tennessee or by the Tennessee Department of Insurance to conduct insurance transactions in Tennessee, including the marketing and sale of insurance products in Tennessee.

8. Defendant Alliant Insurance Services Inc., was and is a corporation organized and existing under the laws of the State of Delaware and has done business at all relevant times in the State of Tennessee, with its principal office located at 1301 Dove Street, Suite 200, Newport Beach, CA 92660. Alliant Insurance Services Inc., f/k/a Driver Alliant Insurance Services Inc., is licensed with the Tennessee Secretary of State to conduct business in Tennessee and the Tennessee Department of Insurance to conduct insurance transactions in Tennessee, including the marketing and sale of insurance products in Tennessee.

9. Defendant Alliant Services Houston, Inc., was and is a corporation organized and existing under the laws of the State of New York and has done business at all relevant times in

4

the State of Tennessee. Alliant Services Houston, Inc., f/k/a JLT Services Corporation, is licensed with the Tennessee Secretary of State to conduct business in Tennessee and the Tennessee Department of Insurance to conduct insurance transactions in Tennessee, including the marketing and sale of insurance products in Tennessee.

10.     Hereinafter, the Defendants named as Alliant Insurance Services Inc., and Defendant Alliant Services Houston, Inc., will collectively be referenced as "Alliant".

11.     Defendant, Virginia Surety Company, Inc. (hereinafter "Virginia Surety") was and is a corporation organized and existing under the laws of the State of Illinois with its principal place of business located at 175 West Jackson Boulevard, 11th Floor, Chicago, IL, 60604.

## JURISDICTION, VENUE AND CHOICE OF LAW

12.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are 100 or more Class Members and the aggregate amount in controversy exceeds Five Million Dollars ($5,000,000.00) exclusive of interest and costs. Additionally, at least one Class Member is a citizen of a state different from the corporate domiciles of the Defendants.

13.     This case is properly maintainable as a class action pursuant to and in accordance with Rule 23(a) of the Federal Rules of Civil Procedure in that:

> a) The class, which includes an unknown number of persons but certainly more than 100, is so numerous that joinder of all members is impractical;
>
> b) There are substantial questions of law and fact common to the class including those set forth in greater particularity herein; and

5

c) Questions of law and fact enumerated below, which are all common of the class, predominate over any questions of law or fact affecting only individual members of the class;

d) A class action is superior to any other type of action for the fair and efficient adjudication of the controversy;

e) The relief sought in this class action will effectively and efficiently provide relief to all members of the class; and,

f) There are no unusual difficulties foreseen in the management of this class action.

14. The Defendants, collectively and individually, at all relevant times herein conducted substantial business in this district, many of the violations occurred in this district, and many of the acts and transactions alleged in this Complaint occurred in this district.

15. The Court has personal jurisdiction over all the Defendants, who have at least minimum contacts with the State of Tennessee because the Defendants conduct business there and have availed themselves of Tennessee markets through its promotion, sales and marketing efforts, as well as the Defendants' issuance of insurance policies and collection of premiums within Tennessee to and from residents of Tennessee.

16. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

17. Tennessee's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, 14th Amendment, Section 1, and the Full Faith and Credit Clause, Article IV, Section 1, of the U.S. Constitution. Tennessee has a

6

significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs, thereby creating state interests that ensure that the choice of Tennessee state law is not arbitrary or unfair.

18.     The Defendants' actions and omissions of which Plaintiffs complain were directly targeted at residents of Tennessee and are in derogation of the State of Tennessee's interest in the regulation of products sold and administered within the state.  Tennessee has an interest in regulating the Defendants' conduct in marketing, selling, collecting premiums for and administering insurance products within its borders to its residents and in preventing fraud and other misconduct being committed against those residents.

19.     Tennessee residents were the target of these Defendants' marketing, selling, collecting premiums for and administration of insurance, and the Defendants' misconduct injured and affected Plaintiffs and the Class Members residing in Tennessee.

20.     Accordingly, the application of Tennessee's laws to the Plaintiffs and proposed Class Members is appropriate under Tennessee's choice of law rules because Tennessee has significant contacts to the claims of the Plaintiffs and all members of the proposed Class, and Tennessee has a greater interest in applying its laws here than any other State.

21.     Venue in the United States District Court for the Eastern District of Tennessee is proper because Defendants transact business within this District and a substantial part of the events giving rise to the claims at issue in this Complaint occurred in this District.

22.     Tennessee's substantive laws apply to the proposed Class, as defined herein, because Plaintiffs properly brings this Class Action Complaint in this District alleging violations of Tennessee law, as well as federal statutory claims.

7

## PRELIMINARY ALLEGATIONS

23.     This matter is governed by the law of the State of Tennessee and the United States of America. This matter is not governed by ERISA, 29 U.S.C. § 1001, *et seq.*

24.     This action arises from the wrongful conduct of Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. HealthExtras, LLC, Alliant, Virginia Surety and National Union toward the Plaintiffs and others similarly situated in the State of Tennessee and the United States of America.  Its wrongful conduct included a scheme (hereinafter the "HealthExtras Scheme") which involved fraudulent advertising, marketing, and sale of purported group disability insurance to Tennessee residents who were not members of any group for which such an insurance product was authorized.  This purported insurance coverage was marketed and sold to Tennessee residents for over a decade, despite the knowledge by each Defendant that the product was illegal and that the purported insurance coverage held pursuant to the HealthExtras Scheme is fraudulent and illusory, in that there was no present intention to pay claims under that purported coverage.

25.     The HealthExtras Scheme has operated in Tennessee for over a decade and continues to this day.  Defendants have also participated in similar schemes in other states.

26.     Defendants are jointly and severally liable for the wrongful conduct alleged herein.

27.     This case seeks recovery of all premiums, punitive damages, interest, as well as injunctive and other equitable relief, attorneys' fees and costs, including costs of investigation reasonably incurred, and other damages for unjust enrichment, breach of contract, breach of duty of good faith and fair dealing, conversion, and civil conspiracy.

8

## CLASS ALLEGATIONS

28.     Plaintiffs, Kim and Thomas Broome, bring this action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a Class of individual residents of the State of Tennessee who owned, purchased or paid premiums for disability insurance coverage with Defendants for disability insurance product known as "HealthExtras" from 2000 through the date of class certification.

29.     Plaintiffs, Kim and Thomas Broome, bring this action as class representatives to recover damages and/or refunds from these Defendants for: (a) Unjust Enrichment; (b) Breach of Contract; (c) Breach of Duty of Good Faith and Fair Dealing; (d) Conversion (e) Civil Conspiracy.

30.     This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of the Federal Rules of Civil Procedure Rule 23(a)(1-4) and (b)(1).

31.     The Plaintiffs Class is defined and proposed as follows: All individual persons in the State of Tennessee who own, owned and/or purchased disability insurance coverage and/or paid premiums for disability insurance known as HealthExtras with the Defendants from 2000 through the date of class certification. Collectively, these persons will be referred to as the "Class" and/or "Class Members."

32.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

33.     Excluded from the Plaintiff Class are:

     a)  Defendants and any entities in which any Defendant has a controlling interest;

9

b) Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of any Defendants;

c) The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer or employees assigned to this case;

d) Claims for personal injury, wrongful death and/or emotional distress;

e) Actual identifiable claims for disability benefits that have already arisen that may be payable under the terms of said disability insurance policies;

f) Whether Defendants breached a duty of good faith and fair dealing;

g) Any attorneys representing the Plaintiffs or the Class;

h) All governmental entities; and,

i) Any person having entered into a release of claims with the Defendants concerning these allegations prior to the certification of this class.

34. Numerosity. Fed. R. Civ. P. 23(a)(1). The Class Members are so numerous that their individual joinder is impracticable. The exact number or identification of the Class Members is presently unknown, but it is believed that there are over 100 and most likely thousands of Class Members. The identity of the Class Members is ascertainable. In addition to registration rolls maintained by the Defendants, the Class Members may be located and informed of the pendency of this action by a combination of electronic bulletins, e-mail, direct mail and public notice, or other means.

10

35.     Predominance of Common Questions.     Fed. R. Civ. P. 23(a)(2), 23(b)(3). Common questions of law and fact exist as to all the Class Members and predominate over questions affecting only individual Class Members.     These common questions include the following:

a) Whether Defendants sold disability policies and collected premiums for said insurance policies that were illegal under the law of the State of Tennessee;

b) Whether Defendants illegally sold disability policies and collected premiums for those policies to a group of Tennessee residents that was not and could not be a legal "blanket group" under Tennessee law;

c) Whether Defendants wrongfully increased premiums for those illegal policies;

d) Whether Defendants knew or should have known that selling and collecting premiums for the subject policies was illegal pursuant to applicable Tennessee law and in derogation of the State of Tennessee's interest in regulating the sale of insurance within its borders;

e) Whether the Defendants have been unjustly enriched at the expense of Plaintiffs and the Class Members;

f) Whether Plaintiffs and the Class Members suffered any injury that was proximately caused by the unlawful acts alleged herein;

g) Whether the Defendants acted in conspiracy with each other to perform the illegal acts described herein; and,

h) Whether Plaintiffs and the Class Members are entitled to recover damages proximately caused by the alleged unlawful conduct, including damages

11

recoverable under Tennessee Law for unjust enrichment, breach of contract, breach of duty of good faith and fair dealing, conversion, civil conspiracy, punitive damages, interest, injunctive relief, attorneys' fees, and costs, including reasonable costs of investigation, and other damages.

36.     Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of claims of all of the Members of the Class, all of whom owned or purchased disability insurance coverage or paid premiums for disability coverage through a program known as HealthExtras from July 1, 2000 through the present date.

37.     Adequacy.     Fed. R. Civ. P. 23(a)(4); 23(g)(1).     Plaintiffs are adequate representatives of the Class because they fit within the class definition and their interests do not conflict with the interests of the Members of the Class they seek to represent. Plaintiffs will prosecute this action vigorously for the benefit of the entire Class, they agree to participate in discovery and attend any Court hearings required of them.     Plaintiffs are represented by experienced and able attorneys from coordinated law firms that will collectively and jointly serve as Class Counsel. Class Counsel has litigated numerous class actions, and Plaintiffs' counsel intends to prosecute this action vigorously for the benefit of the entire Class. Plaintiffs and Class Counsel can fairly and adequately protect the interests of all of the Members of the Class.

38.     Superiority. Fed. R. Civ. P. 23(b)(3). The class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class Members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and

12

provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. The class, as defined herein, is ascertainable from the Defendants' records or from records which the Defendants have access and control.

## HISTORICAL BACKGROUND AND FACTUAL ALLEGATIONS

39.     Beginning in approximately 1997, Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., conceived, designed and created a Disability Benefit Program (the "HealthExtras Scheme"). Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., contracted with the late famed Superman actor, Christopher Reeve to endorse the HealthExtras Program. The development of the HealthExtras Program was initially funded by private investment with additional capital raised in 1999 through a public stock offering. The HealthExtras Program included (1) a One Million Dollar ($1,000,000.00) Accidental Permanent and Total Disability Benefit insurance coverage, (2) a Two Thousand Five Hundred ($2,500.00) Out of Area Emergency Accident and Sickness Medical Expense Benefit.

40.     The insurance coverage for the benefits have been underwritten by several insurance companies because neither Defendants, HealthExtras, Inc., or its corporate successors, Catalyst Health Solutions, Inc. or Catamaran Health Solutions, LLC have ever been licensed or authorized by any State or Department of Insurance to conduct the business of insurance. HealthExtras, LLC, the new corporate entity, which now services, administers, collects and allocates premiums for the insurance program has also never been licensed to conduct the business of insurance in any State.

41.     The incorporators of Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., including but not limited to David Blair, CEO of HealthExtras Inc., his father Thomas Blair, as well as

13

Edward S. Civera and Chief Financial Officer, Mike Donovan conceived the HealthExtras Scheme for the purpose of defrauding consumers and gaining an unfair and illegal advantage in the disability insurance market by avoiding state insurance regulations and selling virtually worthless group disability insurance to individuals rather than an actual qualified group.

42.     The HealthExtras scheme operated in the following manner:

    a)  Most states, including Tennessee, have enacted regulations that require Blanket Accident and Sickness Insurance to be sold only to an employer, or special groups of persons.

    b)  Requiring Group Disability Policies to be issued to a "group" allows the group, as the entity with the insurable interest in its members, to scrutinize the terms of coverage and price of coverage to ensure its members are receiving a good insurance product for a fair price. Under these statutes, the Master Policy of insurance is required to be issued to the "group" with certificates of insurance issued by the group to the individual members.

    c)  Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., and its incorporators gained an unfair advantage in the disability insurance market by unilaterally creating their own fictitious group and directly marketing an illusory disability policy to individual consumers; then once enrolled, placing that consumer in the "fictitious group" to conceal the scheme.

43.     Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc.,and its incorporators achieved the unfair advantage and consumer fraud in the following manner:

14

a) Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. entered into agreements with the nation's largest VISA and MasterCard issuing banks (including but not limited to CitiBank, Capitol One and Chase), as well as American Express, and with "other entities" who held branded credit cards for their customers (including JC Penny, Sears and Conoco Phillips) allowing HealthExtras access to their credit card customers to market the HealthExtras Program in all fifty (50) States of the United States of America.

b) These contracts allowed Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc.,access to financial information of the cardholder to assess the prospect of that individual purchasing the HealthExtras Program.

c) By agreement, the credit card issuing companies allowed Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc.,to include a marketing flyer in the cardholder's monthly credit card statements that were delivered to the individual through the United States Mail targeting individual consumers for the HealthExtras Program.

d) Originally, the marketing flyers offered a One Million Dollar ($1,000,000.00) disability insurance product called "HealthExtras" for as little as Nine Dollars and Ninety-Five cents ($9.25) per month or Fourteen Dollars and Fifty cents ($14.50) per month depending on whether the individual added his or her spouse.

e) The marketing flyers contained images of the late famed Superman actor, Christopher Reeve, as well as statements by Mr. Reeve endorsing the

15

HealthExtras Program.

f) Included in the marketing flyers was a short application that allowed the individual cardholder to enroll in the HealthExtras Program by simply completing the application and sending it via the United States Mail in a prepaid envelope to HealthExtras, 6th Floor Processing Center, 2275 Research Blvd., Rockville, MD 20850-8526. This process allowed Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., to enroll large numbers of individual consumers rapidly and with very little expense with no lengthy applications or exams which would be typical of underwriting an individual disability policy.

g) Once the individual cardholder sent the application to Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., he or she was designated as a "member" of a fictitious group and placed into a "Trust" created by Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., and other Defendants, along with other credit card holders from all the 50 States. Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., then began debiting the individual's credit card on a monthly of yearly basis for the insurance premium. Those premiums were then deposited into a "Trust" for distribution to the underwriters, the brokers and to Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc.,

h) Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. entered into contracts with various licensed insurance carriers to make application to each state insurance department for approval of a Blanket Accident and Sickness Policy and underwrite the disability benefits for the HealthExtras Program.

16

i) The underwriters either misrepresented to the state insurance regulators that the Blanket Accident and Sickness Policy was intended to be issued to a valid group under state law. or simply failed to apply for approval of the Policy.

44. This illegal scheme allowed Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc to market and sell the group disability policies directly to individuals and collect premiums directly from individuals.

45. This illegal scheme allowed Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc.,to reap enormous profits. After the Initial Public Offering ("IPO") of HealthExtras Inc., in 1999, in a year 2000 letter to the HealthExtras, Inc., shareholders, CEO David Blair reported that:

> Our revenues increased from $5.3 million in 1999 to $44.2 million in 2000 as our paid enrollments jumped from 105,000 to 450,000 over that period. The increase in enrollments was primarily attributable to the addition of new marketing partners and obtaining approval to sell our products in more states.

See **Exhibit A.**

46. This enormous immediate profit was created in the insurance market due to the fact Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc avoided state insurance regulations requiring the policy to be sold to an actual valid group, as defined by state law, rather than to individuals. Avoiding insurance regulation, rate oversight and the scrutiny of an actual group allowed Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., to fraudulently market and sell illegal group disability policies known as the HealthExtras Program to individuals on a large nationwide scale. These policies, disguised as inexpensive individual disability policies, were then placed in a sham "Trust for the Account of HealthExtras" to create the illusion of a valid group.

17

47.     The fraudulent HealthExtras Scheme resulted in a huge financial windfall for Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc.,and  CEO David Blair. After HealthExtras Inc., and its successor corporation Catalyst Health Solutions were sold for $4.4 billion to SXC Health Solutions, in July 2012 creating the company now known as Catamaran Health Solutions, LLC, David Blair received a $16 million dollar compensation package in 2012 according to a Securities & Exchange Commission filing.  He had earned $9.4 million in 2011. Media reports suggest that David Blair, now 44, is contemplating running for the office of Governor of the State of Maryland.

48.     Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., knew that any underwriter of such insurance would necessarily be required to comply with the insurance regulations of the various fifty (50) states.

49.     In accordance with the HealthExtras Scheme, in 1999 or 2000, Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., caused marketing materials to be sent to Plaintiffs, Kim and Thomas Broome, in connection with their credit card statement, via the United States mails.

50.     Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., marketing materials sent to the Plaintiffs utilized the likeness of actor Christopher Reeve with statements by Mr. Reeve endorsing the HealthExtras Program.

51.     Upon information and belief, after expressing an interest in the HealthExtras Program, Plaintiffs received a letter via the United States mails in 2000 from Defendant HealthExtras, Inc. signed by a "Director of Client Services" that included the following statements:

18

Enclosed please find the HealthExtras program description you requested. Because lives change in an instant, like Christopher Reeve's, HealthExtras was created to provide families with financial security should the unthinkable happen.

$1,000,000 cash payment if you are permanently disabled due to an accident. And as a HealthExtras member, you have two tax-free options: a $1,000,000 lump sum cash payment or a $250,000 cash payment plus $5,000 per month for 20 years.

$2,500 a year in reimbursements for coinsurance and deductibles for healthcare expenses when you are traveling.

52.     This mail solicitation was intended to induce the Plaintiffs to purchase and retain the specified disability insurance, wherein Defendant Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc.,specifically offered the Plaintiffs the opportunity to purchase disability insurance.

53.     Because Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., was not a licensed insurance broker in any State, it fraudulently paid for the use of the name The Sklover Group, Inc, which was a real licensed broker and the corporate predecessor to JLT Services Corporation, which is now known as the Defendant, Alliant Services Houston Inc.  Since 2005, the name Alliant Services Houston Inc. has been used by the HealthExtras Scheme on correspondence and other documents to create the illusion that Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., is a valid insurance broker.

54.     This written solicitation was typical of the solicitations used in the HealthExtras Scheme, which offered disability insurance to certain "targeted" credit card customers.

55.     The Plaintiffs enrolled in the HealthExtras "benefit program" and agreed to pay premiums which subsequently appeared as charges/debits on their credit card statements. Defendant Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc.,accepted the respective named

19

Plaintiffs' enrollment by letter from the Director, Member Services, that advised the Plaintiffs that "you have armed yourself with one of the most exciting and affordable disability plans found anywhere in America today." Additionally, the acceptance letter included a photograph of Christopher Reeve and a message purportedly from him that stated "[b]ecause lives can change in an instant, as mine did, you should have the additional security for yourself and your family that HealthExtras can provide."

56.     These charges that initially appeared on Plaintiffs' credit card statements were shown as being from "C Reeve Disability Ins 800-554-6797 MD." This entry on Plaintiffs' credit card statements further confirmed to Plaintiffs that they were buying disability insurance coverage.

57.     Plaintiffs were charged premiums on a periodic basis, which depending on the period of time, was usually monthly or annually. At various points in time, the HealthExtras Scheme offered a discount if purchasers paid the premium in a single annual lump sum payment, instead of on a monthly basis.

58.     In 2006, the entry on Plaintiffs' credit card statement changed to "Accident Protection PL 800-554-6797 MD."

59.     During the course of the HealthExtras Scheme, premiums were increased at least twice without the approval of the Tennessee Insurance Commissioner in violation of state law.

60.     At some point Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., allowed the Plaintiff's to change the billing of their disability insurance premiums from annually to monthly. Plaintiffs' credit cards were charged for the premiums on the purported disability insurance coverage.

20

61.     For example, the Plaintiffs received statements from Capital One through the United States mail, showing the following charges:

| Date | Amount | Description |
|------|--------|-------------|
| 5/05/06 | $247.00 | Accident Protection Pl 800-654-6797 MD |
| 3/27/07 | $247.00 | Accident Protection Pl 800-654-6797 MD |
| 4/09/08 | $247.00 | Accident Protection Pl 800-654-6797 MD |
| 4/03/09 | **$319.00** | Accident Protection Pl 800-654-6797 MD |

| Date | Amount | Description |
|------|--------|-------------|
| 09/07/12 | $29.90 | Accident Protection Pl 800-654-6797 MD |
| 10/05/12 | $29.90 | Accident Protection Pl 800-654-6797 MD |
| 11/02/12 | $29.90 | Accident Protection Pl 800-654-6797 MD |
| 12/11/12 | $29.90 | Accident Protection Pl 800-654-6797 MD |
| 05/07/13 | $29.90 | Accident Protection Pl 800-654-6797 MD |

62.     The disability coverage sold by HealthExtras Inc. purported to have two primary benefits. First, the Accidental Permanent and Total Disability insurance purports to provide "coverage" of a One Million Dollar ($1,000,000.00) benefit in the event of permanent disability as a result of an accident. Second, an Emergency Accident and Sickness Medical Expense Benefit that is advertised and purported to cover up to Two Thousand Five Hundred ($2,500.00) in medical expenses in the event of accident or sickness while away from home.

63.     On January 1, 2005, Defendant National Union became the underwriter for the One Million Dollar ($1,000,000.00) Accidental and Permanent Total Disability Benefit.

64.     The Plaintiffs' Two Thousand Five Hundred Dollar ($2,500.00) Emergency Accident and Sickness Medical Expense Benefit has been underwritten by Virginia Surety Company, Inc. from the date of their enrollment to present.

21

65.    The Plaintiffs paid accidental disability premiums from 2000 through 2013 for the accidental disability coverage sold to them by Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc.

66.    On October 13, 2008, in response to a request by Kim and Thomas Broome, Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., forwarded the Plaintiffs an "Accident Protection Plan Program Summary" and a "Description of Coverage" of their HealthExtras disability policy. The "Description of Coverage" indicated that it was a "brief description of coverage available under policy series C11695DBG" and that "[i]f any conflict should arise between the contents of this Description of Coverage and the Master Policy SRG 9540519 or if any point is not covered herein, the terms and conditions of the Master Policy will govern in all cases."

67.    Although the Plaintiffs were provided with a copy of policy series C11695DBG, they have never been provided a copy of Master Policy SRG 9540519 which is the operative policy. The Defendants have issued Master Policy SRG 9540519 to themselves as the "policyholder" Further, neither policy series C11695DBG nor Master Policy SRG 9540519 have ever been issued to a lawful blanket group in Tennessee. Upon information and belief, no member of the proposed class has ever been provided a copy of Master Policy SRG 9540519. The HealthExtras Plan Description (policy series C11695DBG) contains extremely restrictive, conflicting and confusing terms and exclusions which renders any disability insurance "coverage" virtually worthless to consumers and is in sharp contrast and directly contradicts representations made in the marketing material developed and delivered to Tennessee residents by the Defendants.

22

## THE HEALTHEXTRAS SCHEME IS FRAUDULENT

68.     The marketing materials for the HealthExtras Program represented that it provided affordable coverage for low probability, high consequence events, such as disability. Neither in those materials nor anywhere else, however, did any Defendant ever disclose that nearly all of the purported premiums paid by the victims went to marketing expenses and profits for Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., or fees paid to the banks that made their credit card customer information available to Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., for marketing purposes.

69.     For example, when monthly premiums for the One Million Dollar HealthExtras disability benefit were $15.95 per month, only $2.24 of that amount was paid to National Union, the purported underwriter of the disability policy. In other words, less than 15% of the premium paid by the Plaintiffs for disability coverage actually went to an insurance company. When Kim and Thomas Broome paid $29.90 for the HealthExtras Program, only $2.24 of that amount was paid to National Union, the purported underwriter of the disability policy. In other words, in 2012 and 2013 less than 9% of the premium paid by the Plaintiffs for disability coverage actually went to an insurance company. Roughly 80% to 90% of the insurance premiums paid to the HealthExtras Scheme by the Plaintiffs has been collected by the HealthExtras entities (HealthExtras, Inc., Catalyst Health Solutions, Inc., Catamaran Health Solutions, LLC and HealthExtras, LLC) and has not paid for insurance coverage or paid for anything that would benefit the Plaintiffs. Those funds have been collected by the HealthExtras entities to further the illegal HealthExtras Scheme and represent a loss to the Plaintiffs as they derived no benefit from the payment of those funds to the HealthExtras Scheme.

70.     Persons who purchased purported disability insurance coverage under the HealthExtras Scheme have been denied disability benefits even after suffering catastrophic injuries which rendered them disabled.

71.     Although the coverage description disclosed some limitations on coverage under the policy, neither Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., or HealthExtras, LLC, nor any other Defendant disclosed to the victims of the scheme, that only a small fraction of the purported premiums actually went to an insurance company, nor did they disclose there was no intention to pay disability benefits that fell within the terms of coverage. In other words, neither Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., or HealthExtras, LLC, nor any other Defendant ever disclosed that the purported disability insurance coverage was illusory.

## THE PURPORTED HEALTHEXTRAS DISABILITY POLICY IS ILLEGAL UNDER TENNESSEE LAW

72.     Defendants circumvented Tennessee laws and regulations governing the issuance of group accident and sickness insurance in order to carry out the HealthExtras Scheme.

73.     A group accident and sickness policy differs from an individual policy in that a single master policy is issued to a group or association, as opposed to an individual person. Thus, the group is the actual policyholder. Each member of the group that is provided coverage under the master policy is issued a Certificate of Insurance that is required to summarize the coverage terms and explain the individual's rights under the master policy.

74.     Tennessee Insurance Code, T.C.A. § 56-26-101 defines "Blanket accident and sickness insurance" as follows:

24

**(1) (A)** "Blanket accident and sickness insurance" means that form of accident and sickness insurance covering special groups of persons as enumerated in one (1) of the following divisions:

**(i)** Under a policy issued to any common carrier, which shall be deemed the policyholder covering a group defined as all persons who may become passengers on the common carrier;

**(ii)** Under a policy issued to an employer, who shall be deemed the policyholder, covering any group of employees defined by reference to exceptional hazards incident to the employment;

**(iii)** Under a policy issued to a college, school or other institution of learning, or to the head or principal thereof, which or who shall be deemed the policyholder, covering students or teachers;

**(iv)** Under a policy issued in the name of any volunteer fire department or first aid or other similar volunteer group, which shall be deemed the policyholder, covering all of the members of the department or group; or

**(v)** Under a policy issued to any other substantially similar group which, in the discretion of the commissioner, may be subject to the issuance of a blanket accident and sickness policy.

75.     The insurance coverage sold pursuant to the HealthExtras Scheme did not meet the requirements of T.C.A. § 56-26-101 and represents Fictitious Grouping under T.C.A. § 56-8-102(a)(7). The policy was not issued to any entity or group authorized under Tennessee law.

76.     In an extraordinary display of self-dealing, the Defendants created a "Trust," which the Defendants own and control which is called the "AIG Group Insurance Trust, for the Account of HealthExtras." This is a fictitious, illegal and sham Trust that is alter-ego of the Defendants, with premiums collected for the benefit of them rather than a valid group of persons. There is no constitution or bylaws and the HealthExtras "members" have no voting privileges or representation on any boards or committees. This "Trust" was created for the sole purpose of selling the HealthExtras disability insurance to consumers with no supervision or oversight.

25

77.     There was no organization of holders of VISA, MasterCard and American Express credit cards that was formed in good faith for purposes other than that of obtaining insurance when the HealthExtras program began, nor has any such organization existed during the time period relevant to this case.

78.     Upon information and belief, the Tennessee Department of Insurance has not approved either disability policy series C11695DBG nor Master Policy SRG 9540519 for sale to any eligible groups in Tennessee or otherwise to any Tennessee consumers. The "Description of Coverage" sent to the Broomes on October 13, 2018 from Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., indicates the following information:

> **Underwritten by:**
> National Union Fire Insurance Company of Pittsburgh, Pa.
> a division of American International Group, Inc. (AIG)
> (herein referred to as the Company)
> 70 Pine Street
> New York, NY 10270
>
> **Policyholder:**          AIG Group Insurance Trust, for the Account of HealthExtras
> **Master Policy Number:**  9540-519
> **Effective Date:**        September 1, 2004

79.     Under the HealthExtras Scheme, instead of the policy being issued to a group authorized by Tennessee law, the policy was issued to a purported trust, most recently "AIG Group Insurance Trust, for the Account of HealthExtras." These trusts, including the AIG Group Insurance Trust, were sham organizations that were formed by the Defendants and functioned as their alter egos. These sham "trust" organizations had no constitution or bylaws and the HealthExtras "members" had no voting privileges, representation, participation or involvement in these purported trusts, which were created to facilitate the HealthExtras Scheme by avoiding regulatory supervision and oversight.

26

80.     Upon information and belief, although Tennessee law prohibited any group policy from being issued or delivered in this state unless a copy of the form of the policy has been filed with and approved by the Commissioner of Insurance, no such filing or approval occurred with regard to any policy at issue in this case. The Tennessee Department of Insurance has not approved the policy for issuance or delivery to any eligible blanket groups in Tennessee.

81.     The HealthExtras disability policy issued by Defendants was not issued in compliance with Tennessee law. The "AIG Group Insurance Trust, for the Account of HealthExtras" is not a real group that was or is eligible to purchase group disability insurance under applicable Tennessee law. The HealthExtras Scheme represents Fictitious Grouping under T.C.A. § 56-8-102(a)(7).

82.     The purported group to whom disability insurance was sold pursuant to the HealthExtras Scheme consists of persons whose only commonality is that they have a credit card and were chosen by HealthExtras and others as good marketing prospects. The group of which the Plaintiffs and other Class Members are a part of was formed by Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., and the other Defendants solely to facilitate the HealthExtras Scheme.

83.     Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., National Union, Alliant, HealthExtras, LLC and Virginia Surety formed a sham group in order to circumvent regulatory supervision and scrutiny. Because there was no legitimate group, there was no one to look out for the interests of the persons paying for the purported disability coverage. More specifically, there was no legitimate entity or organization to scrutinize the scope of the coverage and whether it was reasonable for the amount paid, determine where the money paid for the purported disability coverage was going, (i.e., whether it was being used to purchase insurance coverage or

27

simply fuel for a marketing scheme), or monitor whether covered disability claims were actually being paid.

84.     Because there was no legitimate group or organization involved, there was no mechanism or structure for purchasers of disability coverage to communicate with one another concerning cost, coverage, or payment of claims. Upon information and belief, Master Policy SRG 9540519 concealed from victims is a virtually worthless policy with no real value to consumers, but the consumer could not readily determine this fact because the Defendants created a sham trust and issued the policy to that trust as the "policyholder." This resulted in preventing oversight by a real group representative.

85.     Upon information and belief, National Union did not submitted an application for blanket accident and sickness insurance coverage in Tennessee. Plaintiffs have been able to confirm which applications were filed in some other states, but those applications merely serve to confirm the fraudulent nature of the HealthExtras Scheme. For example, under some of those applications, the policy holder is sometimes shown as AIG Group Insurance Trust, but at other times as "HealthExtras." HealthExtras is shown as the participating organization, i.e., the group, but the eligible persons are described as "all customers of participating organization or policy holder."

86.     "Customers" of HealthExtras do not constitute a group recognized under T.C.A. § 56-26-101.

87.     The HealthExtras Scheme succeeded in allowing the Defendants to circumvent the law and gain an unprecedented and unfair advantage in the market against companies offering a legitimate disability policy. It derived credibility from a spokesperson who was a

28

well-liked and respected actor who had suffered a tragic accident. That credibility was ultimately further enhanced by the participation of National Union, Alliant and Virginia Surety. The HealthExtras Scheme targeted a large pool of potential customers who, although purportedly members of a group, in fact had no legitimate organization or entity protecting their interests and no mechanism for learning, short of becoming disabled themselves and being denied coverage, that the purported insurance coverage they were being sold was illusory and worthless.

88. Victims of the HealthExtras Scheme had no access to the policy, did not know only a tiny fraction of the money they were paying for coverage ever went to an insurance company, did not know the policy holder was a sham organization and the alter-ego and instrumentality of the perpetrators of the scheme, and did not know the purported disability insurance coverage they were purchasing was illegal, illusory and worthless.

89. Plaintiffs and others similarly situated would have had a confidential relationship of trust and confidence with a legitimate group. By creating a fictitious group to facilitate the HealthExtras Scheme, Defendants assumed the obligations of that confidential relationship.

## A SCHEME OF FALSE AND DECEPTIVE ADVERTISING

90. The HealthExtras Scheme targeted the Plaintiffs and other Tennessee residents, before and after enrolment, with direct mail advertisements that included, but were not limited to the following misleading statements:

> a) "This program provides valuable protection in the event you become permanently totally disabled due to an accident."
>
> b) "This HealthExtras Benefit Program provides you with a $1,000,000 tax-free cash payment if you're permanently disabled due to an accident."

29

c) "If an accident leaves you - the primary member - permanently disabled, you will receive a lump sum payment of $1,000,000."

d) "After 12 months of continuing and permanent disability caused by an accident - including the inability to work - the primary member will receive a payment of $1,000,000."

e) "You're covered with a $1,000,000 tax-free cash payment if you are permanently disabled as a result of an accident."

91.    These direct mail advertisements did not disclose that the program was illegal, fraudulent and illusory, and that harsh exclusions limited almost all claims, or that there was no intent to pay disability claims under the policy.

## THE ROLE OF DEFENDANT HEALTHEXTRAS, LLC
## IN THE HEALTHEXTRAS SCHEME

92.    HealthExtras, LLC is a limited liability company, formed and organized by officers and directors of HealthExtras, Inc., and Catalyst Health Solutions, Inc., in October 2010.

93.    In July 2012 HealthExtras, LLC, was owned and operated by Catamaran Health Solutions, LLC, as the successor corporation of HealthExtras, Inc. and Catalyst Health Solutions, Inc. On August 1, 2012 Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., purportedly sold HealthExtras, LLC to a different entity. However, the president of HealthExtras, LLC, Mark Nardone, was formerly a Vice President of Catalyst Health Solutions, Inc., the corporate predecessor to Catamaran Health Solutions, LLC.

94.    Upon information and belief, the officers and directors of Catamaran Health Solutions, LLC, sold HealthExtras, LLC in order to distance the name HealthExtras and the illegal HealthExtras Scheme from Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc.

95.    Upon information and belief, since its formation in October 2010, HealthExtras, LLC has serviced, administered and collected insurance premiums from the HealthExtras

30

Scheme. Accordingly, HealthExtras, LLC is liable to the Plaintiffs for all of the same acts as its predecessors, HealthExtras, Inc., Catalyst Health Solutions, Inc. and Catamaran Health Solutions, LLC.

## DEFENDANT NATIONAL UNION'S PARTICIPATION IN THE HEALTHEXTRAS SCHEME

96. Defendant National Union's participation in the HealthExtras Scheme includes, but is not limited to the following:

97. Neither the Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., nor HealthExtras, LLC is a licensed insurance company anywhere.

98. Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., participated in developing the policy language and determined the amount of premiums charged.

99 The purported underwriter, National Union, accepted nominal payments to lend credibility to the HealthExtras Scheme, but did not possess any intention to pay claims.

100. Defendant National Union has an extensive history of violating insurance laws and regulations applicable to the sale of group insurance.

101. On or about January 7, 2011, Defendant National Union entered into an Interim Consent Order with the Ohio Department of Insurance during the course of an examination of National Union's Accident and Health Division for the period January 1, 2008 through June 30, 2010. The January 7, 2011 Interim Consent Order concerned the marketing of group blanket accident/sickness policies to individuals who were customers of certain banking institutions.

102. On February 14, 2012, Defendant National Union entered into another Interim Consent Order concerning the marketing and sale of non-employer group policies for which

31

premium rates and the classification of risks pertaining thereto had not been approved by state regulators.

103.     In September 2012, Chartis, Inc., the parent company of Defendant National Union, entered into a Multi-State Examination Regulatory Settlement Agreement on behalf of itself and certain of its insurance company subsidiaries, including Defendant National Union, which superseded the Interim Consent Orders dated January 7, 2011 and February 14, 2012. Pursuant to the Multi-State Examination Regulatory Settlement Agreement, Chartis, Inc. agreed to pay, on behalf of itself and certain of its insurance company subsidiaries, including Defendant National Union, a minimum of $39 million and a maximum of $51 million in Administrative Penalties.

104.     Among the subject matters of the Multi-State Examination Regulatory Settlement Agreement were policy issuance to groups and associations and the use of trusts.

105.     Upon information and belief,   National Union knew that Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., was not a licensed insurance broker and could not legally solicit consumers to purchase the disability insurance known as the HealthExtras Program.

106.     Upon information and belief, National Union knowingly allowed Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., as well as HealthExtras, LLC to use its name on pre-printed forms from  the HealthExtras offices in Rockville, Maryland  to solicit consumers in Tennessee to buy disability insurance known as the HealthExtras Program.

107.     Upon information and belief, National Union knew that the various trusts, as well as the current "AIG Group Insurance Trust, for the Account of HealthExtras" did not constitute a valid group under Tennessee law.

108.    Upon information and belief, National Union received fees from the HealthExtras Scheme that it knew to be illegal.

## THE ALLIANT DEFENDANTS' PARTICIPATION
## IN THE HEALTHEXTRAS SCHEME

109.    The Alliant Defendants' participation in the HealthExtras Scheme includes, but is not limited to the following:

110.    The purported Broker of Record, Alliant, as corporate predecessor to The Sklover Group, Inc, and JLT Services Corporation, accepted nominal payments to lend its name and credibility to the HealthExtras Scheme and to create the illusion of a valid solicitation of a disability insurance policy.

111.    Upon information and belief, Alliant knew that Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., was not a licensed insurance broker and could not legally solicit consumers to purchase the disability insurance known as the HealthExtras Program.

112.    Upon information and belief, Alliant allowed Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc., well as HealthExtras, LLC to use its name on pre-printed forms from the HealthExtras offices in Rockville, Maryland to solicit consumers in Tennessee to buy disability insurance known as the HealthExtras Program.

113.    Upon information and belief, Alliant knew that the underwriters of the HealthExtras Program had no intent to pay claims.

114.    Upon information and belief, Alliant knew that the various trusts, as well as the current "AIG Group Insurance Trust, for the Account of HealthExtras" did not constitute a valid group under Tennessee law.

33

115.    Upon information and belief, Alliant received fees from the HealthExtras Scheme it knew to be illegal.

## THE DEFENDANT VIRGINIA SURETY'S PARTICIPATION
## IN THE HEALTHEXTRAS SCHEME

116.    Defendant Virginia Surety's participation in the HealthExtras Scheme includes, but is not limited to the following:

117.    Upon information and belief, Virginia Surety, the underwriter for the Two Thousand Five Hundred ($2,500.00) Out of Area Emergency Accident and Sickness Medical Expense Benefit in the HealthExtras Program accepted nominal payments to lend its name and ad credibility to the HealthExtras Scheme.

118.    Upon information and belief, Virginia Surety knew HealthExtras Inc., now Catamaran Health Solutions, LLC was not a licensed insurance broker and could not legally solicit consumers to purchase the disability insurance known as the HealthExtras Program.

119.    Upon information and belief, Virginia Surety knowingly allowed HealthExtras Inc., now Catamaran Health Solutions, LLC, as well as HealthExtras, LLC to use its name on pre-printed forms from the HealthExtras offices in Rockville Maryland to solicit consumers in Tennessee to buy disability insurance known as the HealthExtras Program.

120.    Upon information and belief, Virginia Surety knew that the various trusts, as well as the current "AIG Group Insurance Trust, for the Account of HealthExtras" did not constitute a valid group under Tennessee law.

121.    Upon information and belief, Virginia Surety received fees from the HealthExtras Scheme that it knew to be illegal.

34

## JOINT ENTERPRISE AND CONSPIRACY TO DECIVE
## THE PUBLIC AND VIOLATE TENNESSEE LAW

122.    All Defendants engaged in a joint enterprise and conspiracy to utilize their efforts to sell, broker, underwrite, collect, allocate and share premiums derived from the HealthExtras disability program to Plaintiffs and the putative Class Members, for their own individual and mutual benefit, without fully disclosing to Plaintiffs and the putative Class Members that the policies being sold to them did not and could not comply with Tennessee law, and said lack of compliance was material information about such policies.

123.    Defendants engaged in agreements for a common purpose, a common pecuniary interest, and a joint venture to share illegal profits and all Defendants engaged in at least one act in furtherance of the illegal HealthExtras scheme.

124.    As a result, the Defendants are jointly and severally liable for any and all damages or restitution the Plaintiffs and Class members are entitled to recover in this action.

## FIRST CAUSE OF ACTION
## Unjust Enrichment
## (All Defendants)

125.    Plaintiffs, on behalf of themselves and all other similarly situated Tennessee residents reassert and reallege each of the factual allegations set forth in Paragraphs 1 through 124, all as if specifically set forth more fully herein and further allege:

126.    Defendants have been and continue to be enriched by their acts and omissions alleged herein.

127.    These deceptive acts and omissions allow Defendants to obtain millions of dollars from Tennessee residents that would not have been gained, but for Defendants' acts and omissions.

35

128. Plaintiffs and the proposed Class members and those similarly situated unknowingly purchased illegal, unapproved, and virtually worthless insurance and paid Defendants an amount that far exceeds the value of the insurance product identified herein as a result of Defendants' acts and omissions.

129. Plaintiffs and the Class members suffered damages due to the Defendants' acts and omissions as alleged herein.

130. Defendants have and continue to be unjustly enriched as a result of their deceptive acts and omissions.

131. Defendants lack any legal justification for engaging in a course of deceptive acts and omissions as alleged herein at Plaintiffs' and the Class' expense.

132. No other remedy at law can adequately compensate Plaintiffs and the Class Members for the damages occasioned by Defendants' conscious and willful choice to engage in a course of deceptive acts and omissions.

133. When seeking to purchase accidental disability insurance and emergency accident and sickness insurance, Plaintiffs, and the putative Class Members have a choice of various underwriters, coverage amounts and coverage terms.

134. Plaintiffs and the putative Class Members purchased their HealthExtras disability insurance in order to protect themselves should they suffer disability as a result of an accidental injury or accident or sickness while traveling. However, the actual HealthExtras policy is virtually worthless and illegal.

135. Defendants, individually and collectively, failed to disclose that the insurance coverage being sold to Plaintiffs and the putative Class Members was illegal under Tennessee

36

law in that Plaintiffs and the putative Class Members were not members of a lawful "blanket group."

136.    By purchasing the HealthExtras program that included the component policies and paying fees and premiums, Plaintiffs and the putative Class Members conferred a benefit upon the Defendants, without knowledge that the purchased coverage was illegal and virtually worthless.

137.    Defendants knowingly accepted and retained this non-gratuitous benefit conferred upon them by Plaintiffs and the putative Class Members despite Defendants' knowledge the subject policies were illegal as a matter of Tennessee law for the reasons enumerated herein.

138.    Plaintiffs and the putative Class Members have spent and continue to spend thousands of dollars in premium payments for illegal policies that could never be lawfully sold to Tennessee residents.

139.    The Defendants have been unjustly enriched in retaining the payments paid by Plaintiffs and the putative Class Members for the Accidental Permanent and Total Disability coverage and the Emergency Accident and Sickness Benefit insurance coverage.

140.    The Defendants' retention of the non-gratuitous benefit conferred by Plaintiffs and the putative Class Members under these circumstances is unjust and inequitable.

141.    No other remedy at law can adequately compensate Plaintiffs and the putative Class Members for the economic damages resulting from Defendants' wrongful actions as alleged herein.

142.    Because Defendants' retention of the non-gratuitous benefit conferred upon them

37

by Plaintiffs and the putative Class Members is unjust and inequitable, Defendants must pay restitution in the form of disgorgement of all revenues, earnings, profits, compensation and benefits which Tennessee residents have paid to the conspirators as a result of such business acts and practices.

## SECOND CAUSE OF ACTION
### Breach of Contract and the Duty of Good Faith and Fair Dealing
### (All Defendants)

143.    Plaintiffs, on behalf of themselves and all other similarly situated Tennessee residents reassert and reallege each of the factual allegations set forth in Paragraphs 1 through 142, all as if specifically set forth more fully herein and further allege:

144.    Defendants have breached its contract with the Plaintiffs and similarly situated Tennessee residents and the duty of good faith and fair dealing owed in all contracts in Tennessee by engaging in the conduct set forth hereinabove.

145.    Defendants, individually and collectively, knew the HealthExtras disability policy could only be issued to legal "blanket groups", that the HealthExtras disability policies were sold to individuals who were not members of a lawful "blanket group" under Tennessee law, instead using the guise of insurance trusts in place of a lawful blanket group.

146.    Despite Defendants' collective knowledge, Defendants failed to reveal to Plaintiffs, and other similarly situated Tennessee residents, that their HealthExtras disability policies were illegal and of little value; their premiums were thus illegal and not approved; they paid for illegal policies; and they were not part of any lawful blanket group as required under Tennessee law.

38

147. Despite this duty, Defendants sold illegal HealthExtras insurance policies, collected premiums therefore and shared the monies derived there from Plaintiffs, and other similarly situated Tennessee residents and thus breached the duty of good faith and fair dealing as a matter of law. This breach proximately caused damages to Plaintiffs, and other similarly situated Tennessee residents.

148. Plaintiffs, and other similarly situated Tennessee residents, have been proximately injured as a result of the Defendants' breach of the duty of good faith and fair dealing and are thus entitled to damages proximately caused them by said breach.

## THIRD CAUSE OF ACTION
### Civil Conspiracy
### (All Defendants)

149. Plaintiffs, on behalf of themselves and all other similarly situated Tennessee residents reassert and reallege each of the factual allegations set forth in Paragraphs 1 through 148, all as if specifically set forth more fully herein and further allege:

150. All Defendants engaged in a conspiracy to utilize their efforts to sell disability insurance policies to Plaintiff and the Class Members, for their own individual and mutual benefit, without fully disclosing to Plaintiffs and the Class Members that the policies being sold to them did not and could not comply with Tennessee Law, said lack of compliance being material information about such policies. Further, this lack of disclosure constitutes an omission of material fact regarding the supposed policies as the same have no value. As a result, Plaintiffs and the Class members purchased and retained disability insurance policies solicited, marketed, sold, serviced, underwritten, and administered by Defendants, and paid to Defendants monthly or annual premiums for insurance policies that had no value.

39

151. In the marketing, sale, and administration of the illegal "policies" as issued by National Union, marketed by HealthExtras, brokered by Alliant, and placed with Group Insurance Trust, all Defendants agreed and conspired, as described herein, for the purpose of lawful activities by unlawful means, or unlawful activities by lawful means.

152. Defendants committed at least one overt act, as described herein, in furtherance of the aims of the agreement and pursuant to a common scheme.

153. As a direct result of Defendants' conspiratorial actions, Plaintiffs and the Class Members have suffered damages.

## FOURTH CAUSE OF ACTION
### Conversion
### (All Defendants)

154. Plaintiffs, on behalf of themselves and all other similarly situated Tennessee residents reassert and reallege each of the factual allegations set forth in Paragraphs 1 through 153, all as if specifically set forth more fully herein and further allege:

155. Defendants, individually and collectively, contracted with the Plaintiffs, and other similarly situated Tennessee residents, to pay a premium for insurance coverage. Defendants unilaterally increased that premium and debited Plaintiffs', and other similarly situated Tennessee residents, account for more than the contractual obligation.

156. By their actions, the Defendants have appropriated the Plaintiffs', and other similarly situated Tennessee residents', property to their own use beyond use and benefit beyond that which the contract calls for.

157. Plaintiffs, and other similarly situated Tennessee residents, assert that this exercise of dominion and control over Plaintiffs', and other similarly situated Tennessee

40

residents, funds debited outside the terms of the agreement, was an intentional act and in defiance of Plaintiffs', and other similarly situated Tennessee residents', true rights.

158. Plaintiffs, and other similarly situated Tennessee residents, assert that Defendants individually and collectively have converted their funds and that by this conversion, Plaintiffs, and other similarly situated Tennessee residents, have been injured and damaged by this conversion and the taking of the funds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all Class Members, demand judgment against Defendants as follows:

1. An order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class Representatives and their attorneys as Class Counsel to represent the Class Members;

2. An order declaring the HealthExtras disability policy illegal under Tennessee law and against public policy;

3. An order entering judgment in favor of Plaintiffs, and the Class Members against the Defendants for damages under the above stated causes of action in an amount to be proven at trial;

4. An order awarding damages in the form of actual damages, and punitive damages against Defendants in favor of Plaintiffs and putative Class Members in an amount to be determined by the Court as fair and just given Defendants' wrongful conduct;

41

5.     Injunctive relief in the form of an Order prohibiting further the Defendants' unlawful activities in the State of Tennessee or an order of such other non-monetary relief as may be necessary and proper; and

6.     An order awarding Plaintiffs and the Class their reasonable attorneys' fees, expenses and costs, including costs of investigation reasonably incurred.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class Members hereby demand a jury trial on all claims so triable in this action.

Respectfully submitted this 23 day of May, 2014.

*[signature]*

‾Edward M. Bearman, (14242)
(Admitted pro hac vice
pending formal admissions ceremony)
*Attorney for Plaintiffs*
780 Ridge Lane Blvd. Suite 202
Memphis, TN 38120
Telephone:     901-682-3450
Fax:             901-682-3590
ebearman@jglawfirm.com

### OF COUNSEL

/s/ Aaron C. Hemmings
Aaron C. Hemmings, (NC State Bar No.: 29810)
(pending pro hac vice to be filed)
*Attorney for Plaintiffs*
5613 Duraleigh Road, Suite 151
PO Box 90698
Raleigh, NC 27675
Telephone:     919-277-0161
Fax:             919-277-0162
ahemmings@hemmingsandstevens.com

/s/ Joseph H. Aughtman
Joseph "Jay" H. Aughtman (AL State Bar No. ASB-8081-A43J)
(pending pro hac vice to be filed)
*Attorney for Plaintiffs*
1772 Platt Place
Montgomery, AL 36117
Telephone:     334-215-9873
Facsimile:     334-213-5663
jay@aughtmanlaw.com

43